## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DONALD LOGAN, JR.** | **CIVIL ACTION** |
| **VERSUS** | **NO:    11-2381** |
| **N. BURL CAIN, WARDEN** | **SECTION: "S" (4)** |

### REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, the court has determined that a federal evidentiary hearing is unnecessary.  *See* 28 U.S.C. § 2254(e)(2).[1]

### I.    Factual and State Procedural Background[2]

The petitioner, Donald Logan, Jr., is a state prisoner currently incarcerated and serving a life sentence at the Louisiana State Penitentiary in Angola, Louisiana.[3]

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

[2]The factual background is adapted from the state appellate opinion in *State v. Logan*, 986 So.2d 772 (La. App. 5th Cir. 2008).

[3]Rec. Doc. 3.

The record reflects that the victim, Kelly Marrione, was a recently retired New Orleans police officer.  On July 9, 2003, at approximately 2:30 p.m., Mr. Marrione went to Lowe's to purchase a hand truck.[4]  Kelly Marrione's wife, Karen, reported that her husband returned home at approximately 3:45 p.m. and, while she was in the back bedroom, she heard what sounded like fireworks going off.  As she started walking down the hall, she heard whizzing sounds.  When she turned right to go into the den, she saw a white pickup truck in the driveway.  Her husband subsequently came through the door, steadied himself against the wall, and said, "Get out the way, move, I've been shot."  She thought that her husband was joking, but realized he was not when he collapsed and she saw blood coming from his chest.  At that time, she heard the screeching of tires and the truck quickly leaving her driveway.  She thereafter called 911.

Mr. Marrione was transported by ambulance to Charity Hospital but was pronounced dead in the emergency room.  An autopsy showed that he had sustained three gunshot wounds: one through the left upper arm; a second wound went through the forearm that re-entered the chest penetrating the heart; and a third wound that went into his left elbow.

Logan and his co-defendant, Mark Cambre, were indicted on July 24, 2003 for first degree murder, a violation of La. Rev. Stat. Ann. §14:30.[5]  Logan pled not guilty on July 25, 2003.[6] On June

_____

[5]State Rec. vol. 1 at pp. 1; 51.

[6]State Rec. vol. 1 at p. 2.

20, 2006, the State amended the indictment to charge Logan with second degree murder, a violation of La. Rev. Stat. Ann. §14.30.1 and petitioner pled not guilty to this charge.[7]

Trial began on June 21, 2006 and the jury found Logan guilty as charged of second degree murder on June 26, 2006.[8] On August 11, 2006, Logan filed a Motion for New Trial and a Motion for Post Verdict Judgment of Acquittal and both motions were denied on September 22, 2006.[9] Logan was sentenced to life imprisonment, without benefit of parole, probation, or suspension of sentence on September 22, 2006.[10] The notice of appeal was filed on September 27, 2006.[11]  After multiple extensions by the appellate court due to delays in the production of the transcript, Logan timely filed his appellate brief.

Logan appealed his conviction and sentence on January 10, 2008.[12]  On appeal, Logan raised 4 claims: 1) that the trial court erred in denying a defense motion for change of venue; 2) that the trial court erred in not granting a mistrial when the order of sequestration was violated; 3) that the trial court erred in not granting a mistrial after a juror saw the defendant in shackles; and, 4) that the trial court erred in admitting gruesome photographs into evidence.  His conviction and sentence were affirmed on May 27, 2008, by the Louisiana Court of Appeal, Fifth Circuit. *State v. Logan*, 986

---

[7]State Rec. vol. 1 at p. 52; State Rec. vol. 2 at p. 419.

[8]State Rec. vol. 1 at p. 39; State Rec. vol. 6 at p. 1314. See also, Jury Verdict form dated 6/26/06, State Rec. vol. 17.  The conviction and sentence were obtained in case No. 03-4506, Division "I" in the Twenty-Fourth Judicial District Court, Parish of Jefferson, Louisiana.

[9]State Rec. vol. 1 at pp. 42-47; 50; and, State Rec. vol. 6 at p.1348.

[10]State Rec. vol. 1 at p. 50; State Rec. vol. 6 at pp.1348-1349.

[11]State Rec. vol. 2.

[12]State Rec. vol. 30 contains a copy of Logan's Brief on Appeal.

So.2d at 772. Logan applied for a writ of review/certiorari to the Louisiana Supreme Court which was denied on March 13, 2009.[13] A timely petition for writ of certiorari was filed with the U.S. Supreme Court and ultimately denied on October 5, 2009. *Logan v. Louisiana*, __U.S.__, 130 S.Ct. 142 (2009). His conviction became final on October 5, 2009, when the U.S. Supreme Court denied certiorari. *Medley v. Thaler*, 660 F.3d 833 (5th Cir. 2011); *Giesberg v. Cockrell*, 288 F.3d 268, 271 (5th Cir. 2002).

Logan filed an application for state post-conviction relief (PCR) in the state district court on September 23, 2010, raising four claims for relief. He argued that; 1) his conviction was based upon insufficient evidence; 2) La. Code of Crim. P. art. 782(A), which permits non-unanimous verdicts, was unconstitutional; 3) he was denied the right to remain silent; and, 4) his attorney provided ineffective assistance by failing to object to the non-unanimous verdict, failing to prevent petitioner from testifying at trial, and failing to hire a forensic expert.[14]

The PCR was denied, with written reasons, on January 19, 2011.[15] The trial court found all the claims to be procedurally barred, with the exception of Logan's claims of ineffective assistance of counsel. A timely request for review was filed with the Louisiana Fifth Circuit Court of Appeal,

---

[13]*State v. Logan*, 5 So.3d 117 (La. 2009).

[14]State Rec. vol. 21 for a copy of the PCR application.

[15]State Rec. vol. 21 for a copy of the Trial Court's Order dated 1/19/11.

and denied on April 25, 2011.[16]  Logan then filed a timely writ application with the Louisiana

Supreme Court which was denied on February 10, 2012.[17]

## II.    **Federal Petition**

Logan's federal petition was filed with this court on October 12, 2011, when Logan paid his

filing fee.[18]  Therein, he raises seven claims for relief: 1) the trial court erred in denying a defense

motion for change of venue based on prejudicial pre-trial publicity; 2) the trial court erred in not

granting a mistrial when the order of sequestration was violated; 3) the trial court erred in not

granting a mistrial after a juror saw the defendant in shackles; 4) the trial court erred in admitting

gruesome photographs into evidence; 5)  the State failed to produce sufficient evidence to sustain

the conviction; 6) La. Code Crim. P. art. 782 is unconstitutional under the 4th, 6th and 14th

Amendments and under the Louisiana Constitution, and counsel was ineffective in failing to

challenge the non-unanimous jury; and, 7) defense counsel was ineffective in failing to call a

defense forensics expert to challenge the prosecution's expert's crime scene reconstruction.[19]

---

[16]State Rec. vol. 21, *State ex rel. Logan v. Cain*, 11-KH-214 (La. App. 5 Cir. 4/25/11) (Unpublished Order).

[17]*State ex rel. Logan v. State*, 80 So.3d 479 (La. 2012). The court notes that, at the time Logan filed his federal habeas petition, this writ,  No. 11-0977, was still pending before the Louisiana Supreme Court. On February 28, 2012, the State filed a supplemental response notifying the court that the Louisiana Supreme Court had ruled on the writ and that all of petitioner's claims were now exhausted. See Rec. Doc. 20 at p. 2. Additionally, the court notes that on page 9 of Rec. Doc. 3, Logan's Petition, is a pleading entitled "Motion to Hold Habeas Corpus Petition in Abeyance until the Resolution of Claims Presented in the Louisiana Supreme Court Have Been Rendered". To the extent this pleading could be construed as a motion, although it was not docketed as such, the request has been rendered MOOT due to the fact that Louisiana Supreme Court rendered its decision.

[18]Rec. Doc. 3.

[19]Rec. Doc. 3.

The State filed a response on January 17, 2012, urging the court to dismiss the petition for failure to exhaust state remedies.[20] Logan filed a Reply on February 13, 2012, urging that the Court grant a stay/abeyance of this matter.[21] On February 23, 2012, Logan submitted a letter to the Clerk of Court, attaching proof that the Louisiana Supreme Court had ruled on his writ application and requesting that the court rule on his petition.  The State requested and was granted leave to file a supplemental response on February 28, 2012, and conceded that all claims raised by Logan were now exhausted and that the motion for stay/abeyance was rendered moot.[22] The State argues that Logan's claims numbered 5 and 6 (insufficient evidence and unconstitutional non-unanimous jury verdict) are procedurally barred from federal review. Moreover, the remaining claims, the State asserts, are without merit.

## III.   General Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, went into effect on April 24, 1996[23] and applies to habeas petitions filed after that date. *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S.

---

[20]Rec. Doc. 15.

[21]Rec. Doc. 16.

[22]Rec. docs. 18, 19 and 20.

[23]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. *United States v. Sherrod*, 964 F.2d 1501, 1505 (5th Cir. 1992).

320 (1997)).  The AEDPA therefore applies to Logan's petition, which was filed in this federal court on September 1, 2011.[24]

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

In this case, the State concedes, and the court finds that Logan's federal petition has been timely filed and the claims have been adjudicated by the highest state court and thus are exhausted.[25] As to issues of procedural default, the State urges that two of Logan's claims were procedurally

---

[24]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996,  P.L. 104-132, 110 Stat. 1220 (hereinafter AEDPA), when submitted to federal courts by prisoners acting *pro se*.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999), *cert denied*, 529 U.S. 1057, 120 S.Ct. 1564 (2000); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  According to the records of the clerk of this court, Logan's petition was first received in that office and tendered for filing on September 6, 2011. The petition was filed by the clerk of court on October 12, 2011, when petitioner paid his filing fee. The fact that he paid the filing fee also would not alter the application of the federal mailbox rule to his *pro se* petition. *See Cousin v. Lensing*, 310 F.3d 843, 847 (5th Cir. 2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing *Spotville*, 149 F.3d at 376).  Logan failed to date the signature page on his federal application. He did, however, include the date of September 1, 2011 on the cover letter he sent along with his federal petition. This is the earliest date on which he could have delivered the pleadings to prison officials for mailing and thus the date his petition is deemed filed.

[25]Logan's federal habeas petition is timely filed because 352 days of his one year federal limitations period ran between October 2, 2009, when his state conviction became final, and the initiation of state post-conviction proceedings on September 23, 2010.  Under 28 U.S.C. §2244(d)(2), "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  Since Logan's federal petition was filed prior to completion of state post-conviction proceedings, no additional time ran against Logan's federal statute of limitations.

defaulted in the state courts: sufficiency of the evidence (issue 5) and whether a non-unanimous jury verdict is constitutional (a subpart of issue 6).

## IV.   <u>Procedural Default</u>

In this federal petition, Logan alleges that the State failed to present evidence sufficient to meet the *Jackson v. Virginia* [26] standard.  Specifically, Logan claims that the State fails to establish that he was guilty of second degree murder in that he had the specific intent to kill the victim or killed the victim while engaged in the perpetration or attempted perpetration of an armed robbery or aggravated burglary.  Logan additionally contends that there was insufficient evidence because the State failed to prove beyond a reasonable doubt that he was not acting in self-defense.[27]  A second claim raised by Logan is that the non-unanimous jury verdict obtained in his case, and allowed for under La. Code Crim. P. art. 782(A), is unconstitutional.

Logan raised both of these claims in a state post-conviction application filed in the state courts on September 23, 2010. The state district court ruled, on January 19, 2011, that petitioner's claim of insufficiency of evidence and challenge to the non-unanimous jury were procedurally barred pursuant to La. Code Crim. P. art. 930.4 because the claims could have been, but were not, raised on direct appeal.[28]  These post-conviction claims were also reviewed by both the Louisiana

---

[26]Logan is referring to the sufficiency of the evidence standard set forth by the U.S. Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 315 (1979). In applying this standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

[27]Rec. Doc. 3 at pp. 37 and 45.

[28]State Rec. vol. 30 Trial Court's Order dated 1/19/11. The court also barred Logan's sufficiency of the evidence claim under La. Code Crim. P. art. 930.3, which sets forth the exclusive grounds for granting post-conviction relief. The trial court stated, "The court does not find petitioner's allegations in the first claim [insufficient evidence] sufficient to qualify as a cognizable claim for post-conviction relief."

Court of Appeal, Fifth Circuit, and the Louisiana Supreme Court.  The Louisiana Fifth Circuit ruled that the district court was correct in barring both claims based upon Logan's non-compliance with La. Code Crim. P. art. 930.4, as petitioner should have raised the claims on direct appeal.[29]  The court also specifically found that petitioner "was given an opportunity to state the reason for his failure to raise the claims on appeal on his post-conviction application, but he failed to do so."[30] The Louisiana Supreme Court subsequently denied relief, without written reasons.[31]

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and adequate to support that judgment. *Coleman v. Thompson*, 501 U.S. 722, 729-30; *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir.1997); *Amos v. Scott*, 61 F.3d 333, 338 & n.10 (5th Cir.1995) (citing *Harris v. Reed*, 489 U.S. 255, 260, 262 (1989)). This "independent and adequate state-law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review. *Amos*, 61 F.3d at 338.

Procedural default does not bar federal court review of a federal claim raised in a habeas petition unless the last state court to render a judgment in the case has "clearly and expressly" indicated that its judgment is independent of federal law and rests on a state procedural bar.  *Amos*, 61 F.3d at 338; *Harris*, 489 U.S. at 263; *Glover*, 128 F.3d at 902. When the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the

---

[29]La. Code Crim. P. art. 930.4(C) bars a post-conviction claim "[i]f the application alleges a claim which the petitioner raised in the trial court and inexcusably failed to pursue on appeal . . ."

[30]A copy of the Fifth Circuit's decision is located in State Rec. vol. 30, Writ No. 11-KH-214 dated 4/25/11.

[31]*State ex rel. Logan v. State*, 80 So.3d 479 (La. 2012).

federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991).

In this case, the last state court to address petitioner's insufficiency of the evidence claim and his challenge to the non-unanimous jury was the Louisiana Supreme Court in Writ No. 11-KH-0977. The Louisiana Supreme Court denied the claims without written reasons. Pursuant to the *Ylst* presumption, that court's decision clearly relied upon the grounds stated by the Louisiana Court of Appeal, Fifth Circuit as that decision was the last 'reasoned' state opinion. *Id.* The Fifth Circuit decision clearly and expressly relied upon the state procedural bar set forth in La. Code Crim. P. art. 930.4(C) when it upheld the trial court's post-conviction ruling and denied relief.

## A.   <u>Independent and Adequate</u>

For the state law procedural bar to prevent review by this federal habeas court, the bar must be independent and adequate. A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural bar. *Amos*, 61 F.3d at 338. The United States Fifth Circuit has held that "[a] state court expressly and unambiguously bases its denial on a state procedural default even if it alternatively reaches the merits of a [petitioner's] claim." *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999). To be "adequate", the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases. *Glover*, 128 F.3d at 902. State procedural rules enjoy a presumption of adequacy when the State court expressly relies upon them in deciding not to review a claim, and the burden is on the petitioner to demonstrate otherwise. *Id.*; *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999).

La. Code Crim. P. art. 930.4(C) is clearly independent state law procedural grounds for denying review of an improperly raised post-conviction claim. *Bennett v. Whitley*, 41 F.3d 1581, 1583 (5th Cir. 1994) (Article 930.4 is independent and adequate basis to bar federal review). *Accord*, *Neal v. Cain*, No. 06-8714, 2012 WL 730223, at *6-*7 (E.D. La. Feb 14, 2012); *Washington v. Cain*, No. 98-0584, 2000 WL 863980, at *4 (E.D. La. June 27, 2000).

The state court in this case expressly ruled that Logan was not entitled to relief on these two claims, because they were not raised on direct appeal. Additionally, petitioner makes no showing that the state procedural rule applied herein has been unevenly applied. Therefore, La. Code Crim. P. art. 930.4(C) is an adequate and independent procedural bar sufficient to prevent federal review of Logan's insufficiency of evidence claim and claim that a non-unanimous jury verdict is unconstitutional.

### B.   <u>Cause and Prejudice</u>

A federal habeas petitioner may be excepted from the procedural default rule only if he can show "cause" for his default and "prejudice attributed thereto," or demonstrate that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice." *Glover*, 128 F.3d at 902 (quoting *Coleman*, 501 U.S. at 750); *Amos*, 61 F.3d at 339 (citing *Harris*, 489 U.S. at 262; *Engle v. Isaac*, 456 U.S. 107, 129 (1982)).

To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The mere fact that petitioner or his counsel failed to recognize

the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default. *Id*. at 486.

In this case, Logan has not offered any cause for the default which would excuse the procedural bar imposed by the Louisiana Fifth Circuit. Nor does the record reveal that any factor external to the defense prevented Logan from raising these claims in a procedurally proper manner. The court has also reviewed his ineffective assistance of counsel claim and find it to be without merit, thereby providing no cause for the default. The record reflects no action or inaction by the State which prevented him from properly raising these claims.

"The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown." *Hogue v. Johnson*, 131 F.3d 466, 497 (5th Cir. 1997) (citing *Engle*, 456 U.S. at 134 n.43). Having failed to show an objective cause for his default, the court need not determine whether prejudice existed, and petitioner has not alleged any actual prejudice. *Ratcliff v. Estelle*, 597 F.2d 474, 477-78 (5th Cir. 1979) (citing *Lumpkin v. Ricketts*, 551 F.2d 680, 681-82 (5th Cir. 1977)).

Logan's claims of insufficiency of the evidence and that a non-unanimous jury is unconstitutional are therefore procedurally barred from review by this federal habeas corpus court. *See Trest v. Whitley*, 94 F.3d 1005, 1008 (5th Cir. 1996) (habeas review precluded when petitioner neglected to allege actual prejudice and cause of failure to comply with state procedural rule

concerning time restriction on filing for state post-conviction relief), *vacated on other grounds*, 522 U.S. 87 (1998).[32]

### C.    **Fundamental Miscarriage of Justice**

Logan may avoid this procedural bar only if a fundamental miscarriage of justice will occur if the merits of his claims are not reviewed.  *Hogue*, 131 F.3d at 497 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).  To establish a fundamental miscarriage of justice, petitioner must provide this court with evidence that would support a "colorable showing of factual innocence."  *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986); *accord Murray*, 477 U.S. at 496; *Glover*, 128 F.3d at 902. "Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted."  *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001) (citations omitted). To satisfy the factual innocence standard, petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to the defendant's guilt.  *Campos v. Johnson*, 958 F. Supp. 1180, 1195 (W.D. Tex. 1997) (footnote omitted); *Nobles*, 127 F.3d at 423 n.33 (actual innocence factor requires a showing by clear and convincing evidence that "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.")  The burden is on Logan to show "actual innocence." *Murray*, 477 U.S. at 495-96. When the petitioner has not adequately asserted his actual innocence, his procedural default cannot be excused under the "fundamental miscarriage of justice" exception.  *Glover*, 128 F.3d at 903.

---

[32]The Supreme Court vacated the Fifth Circuit's opinion on grounds that a court of appeals is not *required* to raise the procedural default argument sua sponte. *Id.*

13

Logan provides no indication and the record contains nothing that suggests his actual innocence on the underlying conviction. He presents no new evidence or argument of innocence that was not already presented to and resolved by the jury and the state courts against him. For these reasons, Logan has failed to overcome the procedural bar, and his insufficiency of the evidence claim (identified in his federal petition as issue 5) and his claim that the non-unanimous jury verdict in his case was unconstitutional (identified as a subpart of issue 6) must be dismissed with prejudice.

## V.    Standards of Review on the Merits

A petition for a writ of habeas corpus is governed by §§ 2254(d) and 2254(e) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Green v. Thaler*, 699 F.3d 404, 411 (5th Cir. 2012) (citing *Holland v. Anderson*, 583 F.3d 267, 271-72 (5th Cir. 2009)). Section 2254(d) provides that a federal court may not grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings unless the" state court's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* (quoting 28 U.S.C. § 2254(d)).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently than the United States Supreme Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal

14

habeas court may grant the writ if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); 28 U.S.C. § 2245(d)(1)). "We review pure questions of law under the 'contrary to' standard of sub-section (d)(1), mixed questions of law and fact under the 'unreasonable application' standard of sub-section (d)(1), and pure questions of fact under the 'unreasonable determination of facts' standard of subsection (d)(2)." *Simmons v. Epps*, 654 F.3d 526, 534 (5th Cir. 2011), *cert. denied*, __ U.S.__ , 132 S.Ct. 2374 (2012) (quoting *Murphy v. Johnson*, 205 F.3d 809, 813 (5th Cir. 2000)).

Further, under § 2254(e)(1), a state court's factual findings are "presumed to be correct." This presumption may only be rebutted by "clear and convincing evidence." *Green*, 699 F.3d at 411 (citing  28 U.S.C. § 2254(e)(1)).

**VI.** __Analysis__

    **A.**    __Change of Venue__

Logan's first claim for habeas relief is whether the trial court denied his right to a fair trial when the court denied the defense motion for a change of venue based upon unusually high pretrial publicity. Logan claims that the murder of a former New Orleans police officer in front of the officer's home in Jefferson Parish in the middle of the day was the subject of extensive publicity throughout Southeast Louisiana. He asserts that the media's numerous reports about the crime "saturated the community and inflamed its collective passions against  [him] which was fully borne out in jury selection."  He also claims that, "[v]irtually every single one of the prospective jurors questioned in voir dire testified that they were familiar with the facts of this case from publicity

and/or local gossip."[33] Therefore, he contends that the defense was forced to use its limited peremptory challenges and had to eventually accept jurors who admitted to having extensive knowledge about the case.[34]

The state, to the contrary, disputes Logan's characterization of the pre-trial publicity and contends that the pre-trial publicity in Logan's case shares little in common with those cases in which the United States Supreme Court has found a presumption of prejudice.  The State also counters that Logan has failed to meet his burden of showing that the jury's exposure to pretrial publicity "color[ed] the jurors' voir dire responses to the point of making them unreliable," thus depriving him of his right to a fair trial and an impartial jury.[35]

Logan appealed the trial court's denial of a change of venue due to pre-trial publicity.[36]  On direct appeal, the Louisiana Fifth Circuit Court of Appeal carefully applied state law in determining whether a change of venue was required due to pre-trial publicity.[37]  After analyzing all the evidence, the court found that the majority of prospective jurors had some knowledge of the case but those jurors were questioned individually about their ability to be fair and impartial. Those jurors

---

[33]Rec. Doc. 3 at p. 31, Logan's Petition.

[34]Rec. Doc. 3 at p. 9.

[35]Rec. Doc. 15 at p. 25, State's Opposition.

[36]Logan actually requested a change of venue on several occasions prior to, during and after trial, including at an open hearing on June 3, 2005, on June 21, 2006 (after jury selection), and again in a defense motion for new trial.

[37]The Louisiana Fifth Circuit considered the factors set forth in the cases of *State v. Bell*, 315 So.2d 307, 311 (La. 1975) and *State v. Manning*, 885 So.2d 1044, 1061-62 (La. 2004). Factors considered included: (1) the nature of pretrial publicity and the degree to which it has circulated in the community;  (2) the connection of government officials with the release of the publicity;  (3) the length of time between the publicity and the trial;  (4) the severity and notoriety of the offense;  (5) the area from which the jury is to be drawn;  (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant;  and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire.

who had connections to the victim's family or had preconceived opinions about the defendant's guilt were excused from the jury. Thus, the court found Logan had failed to show community bias or any actual prejudice.[38]

The United States Supreme Court has examined pretrial publicity which may influence a jury and/or jury pool, warranting a change of venue, in two contexts. The first context occurs where the pretrial publicity is so pervasive and inherently prejudicial that the court cannot expect to find an unbiased jury pool in the community. A court must "presume prejudice" before trial in those cases, and a venue change is necessary. *See Skilling v. United States*, 130 S.Ct. 2896, 2913-2918 (2010). The issue of whether inherent or presumed prejudice is established based upon pretrial publicity is treated as a mixed question of law and fact. *Heath v. Jones*, 941 F.2d 1126, 1134 (11th Cir. 1991), *cert. denied*, 502 U.S. 1077, 112 S.Ct. 981 (1992).   To prevail in showing a presumption of prejudice, Logan must show that the state court's denial of his request to change venue was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.  *See* 28 U.S.C. § 2254(d)(1).

The second context is where the effect of pretrial publicity manifested at jury selection is so substantial as to "infect" the jury.  In such a situation, the court must determine whether "actual prejudice" from the pre-trial publicity prevented the defendant from getting an impartial jury. *Skilling*, 130 S.Ct. at 2913-18.  The issue of whether an individual juror should be disqualified on account of bias from pretrial publicity is a question of fact.  *See Patton v. Yount*, 467 U.S. 1025, 1036 (1984). As such, Logan must show that the state court decision was "based on an unreasonable

---

[38]*Logan*, 986 So.2d at 782.

determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d).

*Presumed Prejudice*

The U.S. Supreme Court has found a presumption of prejudice only in the "extreme case." *Skilling*, 130 S.Ct. at 2915.  The burden is on a petitioner to show that his conviction was "obtained in a trial atmosphere that [was] utterly corrupted by press coverage . . . ." *Skilling*,130 S.Ct. at 2914 (bracket in original) (quotation omitted).  A jury's exposure to news accounts of the crime alone does not presumptively deprive the defendant of due process. *Id.* at 2914-16.  Although application of the "presumed prejudice" standard is relatively rare, where a defendant brings forth evidence of inflammatory and prejudicial pretrial publicity that so pervades the community so as to render virtually impossible a fair trial by an impartial jury drawn by that community, jury prejudice is presumed and there is no further duty to establish bias. *Id.*; *See also Rideau v. State of Louisiana*, 373 U.S. 723, 726-27 (1963).

In *Skilling*, the Supreme Court set forth the following factors to be considered in determining whether the pretrial publicity surrounding a case was presumptively prejudicial: a) the nature of the pre-trial publicity and whether it contained damaging "confession" evidence or other indicia of the defendant's guilt; b) the size and characteristics of the community in which the crime occurred (the larger the jury pool, the less likelihood of prejudice to the jury venire); c) the time lapse between the occurrence of the crime and the actual trial; and, d) any other evidence which might show that the jury had fairly considered the issues and evidence of the case. *Skilling*, 130 S.Ct. at 2915-17.

Relative to the nature of the pretrial publicity, the record establishes that the pretrial publicity consisted of 25 Times-Picayune articles, two letters to the editor from the victim's family, and the victim's obituary, released from July 10, 2003 through March 28, 2005.  The first three articles, dated July 10-25, 2003, discussed the incident when it first occurred.  The information in those articles was of a factual nature and was primarily obtained from the Jefferson Parish Sheriff's Office spokesman, the sheriff, and the first assistant district attorney.  The next three articles, issued August 5-14, 2003, recalled the victim's work as a crime prevention officer in the community.  From August 13-19, 2004, the articles detailed co-defendant, Mark Cambre's, first trial that ended in a mistrial. From March 4-14, 2005, the articles detailed Cambre's second trial, which resulted in a first degree murder conviction and life sentence.  The articles regarding the Cambre trial consisted of a summary of the trial testimony from both sides of the case and focused on Cambre's role in the crime. Having reviewed this material, the court finds that none of the articles were inflammatory nor did they contain damaging "confessional" evidence.  The pretrial publicity, however, did note that the victim was beloved by fellow officers and members of the community for his long-time work in crime prevention programs, particularly the National Night Out Against Crime.[39]

With regard to the size of the community where the crime occurred, according to the United States Census Bureau, Jefferson Parish is one of the largest parishes in Louisiana, encompassing a

---

[39]The Louisiana Court of Appeals, Fifth Circuit, made specific factual findings with regard to the types of pre-trial publicity that surrounded Logan and his co-defendant's trials. *See Logan*, 986 So.2d at 782-83. The factual findings of the state court are entitled to great deference on federal habeas review.  *See Green v. Thaler*, 699 F.3d 404, 411 (5th Cir. 2012) (citing 28 U.S.C. § 2254(e)(1)).  The actual newspaper articles were submitted to the trial court, *in globo*, during the open-court proceedings held on the defense motion for change of venue on June 3, 2005.  *See* State Rec. vol. 2 at p. 352, Transcript of proceedings dated June 3, 2005.  The *in globo* exhibit, however, is not contained in the state court record. The content of the articles, however, is not contested.

large geographical area.[40]  Thus the likelihood of prejudice to the jury pool is reduced.  *See Skilling*, 130 S.Ct. at 2915-17.

As to the third *Skilling* factor, the length of time between the publicity and the trial, the record reflects that the crime and ensuing publicity was approximately three years before Logan's trial and 15 months passed between the publicity of Cambre's second trial and the trial of Logan.[41] As such, defendant was not the subject of media coverage for a prolonged period of time prior to his trial.

Finally, with regard to other evidence which might show the jury fairly considered the issues and evidence, the record shows that the selected jurors returned to the court during jury deliberations with several questions.[42]  Specifically, they requested to review the crime scene reconstruction, an aerial photo of the crime scene, the Power Point presentation, and the rear door of the victim's residence.  They also asked that the responsive verdicts be re-read and explained by the judge, and inquired whether the defendant could still be found guilty of second degree murder and the responsive verdicts of manslaughter and negligent homicide if he was not the one who actually killed the victim.[43] These inquiries evidence that the jury fairly considered the evidence presented and the law which they were instructed to apply.

---

[40]*See* United States Census Bureau, *State & County QuickFacts: Louisiana*, http://quickfacts.census.gov/qfd/states/22000.html (last visited Apr. 4, 2013).

[41]In *Skilling*, the court found a period of four years since the crime and the defendant's trial was sufficient to lessen the impact of pre-trial publicity.  *See id.* at 2916.  The court compared the time lapse to the short period of time between the crime and trial in *Rideau v. Louisiana*, where the defendant was arrested, tried, and convicted in a matter of months.  *Id.*

[42]State Rec. vol. 17.

[43]State Rec. vol. 17.

Based upon the totality of the record and the factual circumstances as developed by the state courts, Logan fails to establish that the pretrial publicity relative to his case was presumptively prejudicial under *Skilling*. Therefore, the Court finds that the trial court's decision was not contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

### Actual Prejudice

*Skilling* also allows a petitioner to establish a violation of due process when he can show actual prejudice was evident during jury selection as a result of pretrial publicity. This inquiry focuses on the nature and extent of the voir dire examination and prospective jurors' responses to it. *See Skilling*, 130 S.Ct. at 2917-23. The constitutional standard for juror impartiality requires that an individual juror be able to "lay aside his . . . opinion and render a verdict based on the evidence presented in court." *See Irvin v. Dowd*, 366 U.S. 717, 723 (1961). "It is not required, however, that jurors be totally ignorant of the facts and issues involved." *Id.* at 722. "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723.

A trial court's finding that a juror is impartial is entitled to deference on federal habeas review. "[S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within the trial judge's province." *Wainwright v. Witt*, 469 U.S. 412, 428 (1985). "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the

venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007) (citing *Witt*, 469 U.S. at 428). Where federal courts do not afford this deference, they "fail[ ] to respect the limited role of federal habeas relief in this area prescribed by Congress and by [the Supreme Court's] cases". *Uttecht*, 551 U.S. at 10. *See also Fuller v. Johnson*, 114 F. 3d 491, 500-01 (5th Cir. 1997) (holding that a trial court's finding regarding whether a juror was biased is entitled to a presumption of correctness under both former 28 U.S.C. § 2254(d) and the amended version found in the AEDPA, codified at 28 U.S.C. § 2254 (e)(1)).

A review of the state court record establishes that jury voir dire was conducted from June 20-21, 2006.[44] An examination of those transcripts establishes that, during jury selection, the trial judge was particularly sensitive to any possible influences from the pre-trial publicity of the case upon the jury. The judge regularly called individual jurors up to the bench for questioning by both counsel if there was the slightest concern that the juror had any outside knowledge of the facts of the case or of the parties or witnesses involved. Moreover, if an individual was called to the bench, all questioning was carefully performed outside of the hearing of other potential jury members in order to insulate the jury pool from potentially prejudicial information.[45]

Also, although the majority of potential jurors in Logan's case indicated they had heard about the killing of a law enforcement officer at his home, few could recall any of the details of the case.

---

[44]State Rec. vols. 7-9, Transcripts of Jury Voir Dire.

[45]*See, e.g.*, State Rec. vol. 7 at pp. 56, 63, 70, 74; State Rec. vol. 8 at pp. 271, 280, 296, 437, 443, 449, 455, 462, 465, 470.

Additionally, most jurors indicated that they could be fair and impartial, could base their verdict on the evidence presented at trial and had formed no opinion as to the defendant's guilt or innocence.  The few members of the jury pool who had any "outside" knowledge of the case or familiarity with any of the witnesses and/or the victim or victim's family were excused for cause.[46] A few potential jurors indicated that they had personal experience with crime and could not be fair based upon their own experience. They were also excused.[47] Although Logan claims that, "[m]ost everyone knew that Mark Cambre had already been convicted of First Degree Murder,"[48] that claim is totally unsupported by the record. Only one potential juror remembered Cambre was tried and convicted and that juror was accepted by the defense in light of her other responses.[49]

In his petition, Logan complains specifically about the bias of two individual jurors: Henricks and Hoefeld.  As to Henricks, Juror 432, Logan complains that she was crying during voir

[46]Juror 327, excused for cause as knew wife of victim and attended the same church; Juror 326, excused for cause as well-acquainted with the case, had good friends who were friends of victim's family, had preconceived idea of the case; Juror 117, excused for cause as knew the victim and could not be fair; Juror 508, excused for cause as was a "casual friend" of victim's wife; Juror 385, excused for cause because of friendships with other law enforcement officers and could not be fair based upon what the juror heard; Juror 267, excused for cause as was "very familiar" with facts of case, had relatives who lived near victim and could not be fair; and Juror 574, excused for cause as had already formed opinion based upon what she heard about the case.  *See* State Rec. vol. 7 at pp. 53-82; State Rec. vol. 8 at pp. 252-302; 434-472, 591-594.  One additional juror, G. Johnson, reported to the court at the start of voir dire that she was very familiar with defense counsel and was not certain if her relationship with him would influence her.  She was dismissed from this case only and reported back to the jury pool.  No juror number was ever noted on the record for juror Johnson. State Rec. vol. 7 at p. 20.

[47]Excused based upon personal experience with crime rather than knowledge of this crime were Jurors 496, 474, 258, and 158.

[48]Rec. Doc. 3 at p. 31, Logan's Petition.

[49]The referenced juror is "Juror 207." This juror indicated that she would try to be fair to the defendant, she could put aside what she had already heard about the case and would base her verdict only on the evidence presented at trial. Juror 207 also stated that she had heard the murder of the police officer was based upon retaliation for something that had occurred earlier, an indication that she could see the crime may have had two sides to the story. Regardless, based upon her responses, the defense decided to accept her. *See* State Rec. vol. 8 at pp. 459-461, Transcript of Jury Voir Dire.

dire because her grandchild lived close by the scene of the crime and was "deeply moved" by the case. Review of the record, however, shows that Ms. Henricks indicated that she was pretty upset at the thought that her grandchildren lived nearby the scene of the crime, she also reported that she had worked for a court for thirty years and believed in the idea that a defendant was "innocent until proven guilty." She also indicated that she could put aside anything that she had heard about the case and could be fair based upon the testimony and evidence.[50]

Subsequently, when the court asked counsel for any challenges for cause, defense counsel requested that Ms. Henricks be struck for cause and the request was rejected by the court. Defense counsel also stated that he noticed Ms. Henricks crying during some of the questioning. The prosecutor noted for the record that, despite being just five feet from Ms. Henricks, he did not see her crying. The trial judge also indicated that if Ms. Henricks was crying, she had missed seeing it. The court ruled that, in light of Ms. Henricks adamantly stating that she could set her prior concerns aside and remain fair and impartial, the challenge for cause was denied. Defense counsel then used a peremptory challenge and excused Ms. Henricks from the jury, without lodging an objection.[51]

On the record before this court, and giving deference to the trial judge's credibility assessment of Ms. Henricks, this court finds Logan has failed to show, by clear and convincing evidence, that the trial judge's factual finding that Ms. Henricks was credible in stating she could be fair in this case was erroneous pursuant to under § 2254(e)(1).

---

[50]State Rec. vol. 8 at pp. 296-298.

[51]State Rec. vol. 8 at pp. 393-94.

The second juror which Logan complains about was Ms. Hoefeld, Juror 456.  Petitioner states that Ms. Hoefeld's husband was an active narcotics officer with the Jefferson Parish Sheriff's office, a fact that shows, according to petitioner, that "[t]he whole community was on the same side for this case."[52]  Logan complains that the trial judge wrongly denied a challenge to Ms. Hoefeld for cause, forcing the defense to use another peremptory challenge to strike her from the jury.

Review of the record shows that defense counsel challenged Ms. Hoefeld for cause, asserting that because of her husband's position with the Jefferson Parish Sheriff's office, she had social contact with some of the officers in the case.  The record shows, however, that although Ms. Hoefeld indicated that she recognized some of the names of witnesses as colleagues of her husband's, she did not personally know them nor had any of them ever visited her socially.[53]  In denying the challenge for cause, the court noted that the juror had indicated she once worked with Milton Dureau in the crime lab but that she indicated she would not be influenced by that fact in the instant case. The court also observed that Ms. Hoefeld was "very firm in her response" that it would not concern her in the least if the jury came back with a not guilty verdict.  The judge said, "I do believe her."[54]

Based upon the questions asked of Ms. Hoefeld and the responses given, as well as the credibility assessment made by the trial judge, Logan's claim that this juror should have been excused for cause simply because her husband was employed by the Jefferson Parish Sheriff's office is insufficient to warrant relief.

---

[52]Rec. Doc. 3 at p. 32, Logan's Petition.

[53]State Rec. vol. 8 at pp. 472-73.

[54]State Rec. vol. 9at p. 569.

Logan fails to meet his burden of establishing actual prejudice due to pre-trial publicity under *Skilling*, 130 S.Ct. at 2913-18.  As such, he cannot show that the state court's factual findings of juror impartiality were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *See* 28 U.S.C. § 2254(d).

For all of the reasons provided above, Logan's claim that he was denied a fair trial when the trial judge denied the defense motion for a change of venue is denied as the trial judge's decision is not clearly contrary to clearly established Supreme Court law.

### B.    Failure to Grant a Mistrial for Violation of Sequestration Order

Logan next claims that the trial judge should have declared a mistrial when a police officer allegedly made "intimidating" remarks in the hallway during trial, in violation of the trial court's order of sequestration.  Specifically, Logan complains that Lt. Dwayne Sheuermann left the stand after testifying and told witness Kristy Masangya, in a loud voice in the hallway, that Logan would not have lived to make it to court if it were up to him.  Logan claims that his mother, Patricia Logan "and all other sequestered witnesses" heard Lt. Scheuermann.  Logan also complains that, in a separate incident that same day, Lt. Grey Thurman also talked loudly, within earshot of the jury. Logan does not identify the subject matter that Thurman discussed.  Based upon these two incidents, Logan claims a mistrial should have been granted.

The State responds to Logan's claim by asserting that Logan fails to establish any prejudice from Lt. Sheuermann's statement.  The State also counters that Logan fails to include the content of Lt. Thurman's statement or even show that his remark was overheard by the jury.

Logan raised this claim on direct appeal.  The Louisiana Court of Appeal, Fifth Circuit resolved the claim under state law, specifically finding that the defendant had failed to indicate the substance of the remarks made by Thurman nor did the record evidence what was said.  Thus, it was impossible to determine, under state procedural rules, whether the remarks were subject to a motion for mistrial.  Additionally, the court noted that defense counsel had failed to move for a mistrial or an admonishment after those remarks were made.  Finally, the court specifically found that the remarks made by Lt. Scheuermann were made in the hallway, were brief, and were not made in front of the jury.  Therefore, the state appellate court concluded those remarks were not within the scope of La. Code of Crim. P. art. 770, the controlling state procedural article which provides the grounds for a mistrial based upon remarks or comments made within the hearing of the jury. *State v. Logan*, 986 So.2d at 783-85.[55]

There is no right of jury sequestration guaranteed by the United States Constitution. *Young v. Alabama*, 443 F.3d 854, 856 (5th Cir. 1971).  Thus, a violation of an order of sequestration is insufficient to raise a claim cognizable on federal habeas review.  *Id.*; *Passman v. Blackburn*, 652 F.2d 559, 569 (5th Cir. 1981) (State court's failure to follow own procedural rules of sequestration of witnesses does not itself raise a federal constitutional question cognizable in habeas corpus).  *See also Middleton v. Burkett*, 2008 WL 4981073, at *6 (E.D. Mich. Nov. 21, 2008) (Sequestration of

---

[55]*See* State Rec. vol. 3 at pp. 551-554, for the complete discussion of the alleged violations of the court's sequestration order, which occurred during in-court proceedings held June 22, 2006.  The court notes that Logan's claim is based solely on Louisiana law and the interpretation and application of its evidentiary and procedural rules.  This federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law."  *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (quotation omitted); *see also Swarthout v. Cooke*, __ U.S. __, 131 S.Ct. 859, 861 (2011) (federal habeas review does not lie for errors under state law); *Molo v. Johnson*, 207 F.3d 773, 776 n.9 (5th Cir. 2000); *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998); *Hogue v. Johnson*, 131 F.3d 466, 506 (5th Cir. 1997) (a disagreement as to state law is not cognizable on federal habeas review).

witnesses is not required by the Due Process Clause); *Bell v. Duckworth*, 861 F.2d 169, 170 (7th Cir.1988) (same); *Mathis v. Wainwright*, 351 F.2d 489, 489 (5th Cir.1965) (noting that the failure to sequester witnesses does not amount to a deprivation of constitutional rights); *King v. Elo*, 2000 WL 791721, at *10 (E.D. Mich. May 25, 2000) (same).  Instead, it is well settled that a federal court's habeas review focuses on due process considerations, and due process requires that the Court grant habeas relief only when the errors of the state courts make the underlying proceeding fundamentally unfair.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  The defining issue for this court, therefore, is whether the denial of the motion for mistrial deprived Logan of a fair trial.

The record shows that defense counsel moved for a sequestration order and the court granted the request, ordering all witnesses to wait outside the courtroom and to refrain from discussing his or her testimony with anyone unless an attorney was present.[56]  Each attorney was also told that he was responsible for his own witnesses.[57]  The sequestration order was specifically waived as to the victim's widow, Karen Marrione, once she had finished testifying.  The sequestration order was also waived as to the State's designated case officer, Lt. Thurman.[58]

---

[56]Under state law, the sequestration rule is contained in La. Code Crim. P. art. 764 (which makes reference to La. Code. Evid. art. 615, Exclusion of Witnesses):

A.  As a matter of right.

> On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the court may exempt any witness from its order of exclusion.

[57]State Rec. vol. 2 at p. 454.

[58]State Rec. vol. 2 at p. 455.

On the first day of trial testimony, Karen Marrione testified first, Kristy Masangya testified third and Lt. Scheuermann testified fifth and last for the day.[59]  On the second day of the taking of trial testimony, defense counsel stated to the court that, as he was leaving court the day before, he found the defendant's mother upset and crying because Lt. Scheuermann had made the statement to Kristy Masangya and another unidentified witness that, "Donald Logan never would have lived to get to court if it had been up to him."[60]

In his petition, Logan indicates that the statement by Lt. Scheuermann was made after Scheuermann had testified,[61] which also indicates the statement, if heard by Kristy Masangya, was made after *she* had testified since Scheurmann testified last.  Accordingly, Logan cannot show that any possible violation of the sequestration order influenced the testimony of Masangya or adversely effected her cross-examination.  Thus, there was no basis for the trial judge to grant a mistrial.

With regard to Lt. Thurman raising his voice before the jury, neither defense counsel at trial nor Logan in his federal habeas has indicated the subject matter which was alleged discussed by Thurman.  As the state appellate court already ruled, without some evidence of the substance of Thurman's comments, it is impossible to determine if Logan was prejudiced by the statement or whether there was any basis for the granting of a mistrial by the trial court.  Also, Lt. Thurman was

---

[59]State Rec. vol. 2, testimony of Karen Marrione begins at p. 465; testimony of Kristy Masangya begins at p. 498; *and*, State Rec. vol. 3, testimony of Lt. Sheuermann begins at p. 519.

[60]State Rec. vol. 3 at p. 551.  Defense counsel did not identify the other witness and Logan does not specify any witness who may have overheard Sheuermann's statement other than Masangya.

[61]Rec. Doc. at p. 34.

specifically excluded from the sequestration order, so his comments could not have instigated a mistrial based upon a violation of the sequestration order.

Logan fails to show that any error of the state court regarding witness sequestration made the underlying proceeding fundamentally unfair. *See Estelle*, 502 U.S. at 67-68. Therefore, he cannot establish that the ruling of the state appellate court upholding the trial court's decision was "an unreasonable application of . . . clearly established Federal law." 28 U.S.C. §2254(d)(1). Logan is not entitled to relief on this claim.

### C.   Failure to Grant New Trial When Juror Viewed Defendant in Shackles

Logan next argues that the trial court erred by failing to grant a new trial when a juror saw him in shackles. Logan relies upon *Deck v. Missouri*, 544 U.S. 622 (2005), for the principle that when a defendant is seen by a juror wearing shackles, he need not establish prejudice to show a due process violation.[62]

The State counters Logan's argument by asserting that the reliance on *Deck v. Missouri* is misplaced. The State asserts that *Deck* has never been extended to the shackling of a defendant being transported to and from court. Instead, the State argues, *Deck* is limited to prevent the jury from seeing a defendant in visible restraints during trial.[63]

Logan raised this claim on direct appeal. The state appellate court reviewed the issue under state law and concluded that the trial court had not abused its discretion in denying the motion for new trial. The court noted that Logan was not shackled or handcuffed during trial. He was only

---

[62]See Rec. Doc. 3 at p. 35, "Petition".

[63]Fed. doc. 13 at p. 35, State's Response.

shackled and handcuffed for purposes of transport to and from the courtroom.  Additionally, the testimony at a hearing held by the trial court supported a finding that the juror may not have seen defendant in restraints.  However, even assuming the juror did see defendant in restraints, the court found that brief incident did not appear to have so prejudiced defendant as to warrant relief on appeal.  *Logan*, 986 So.2d at 789.

The Due Process Clause of the Fifth and Fourteenth Amendments prevents government from taking certain security measures during trial that may prove prejudicial to the defendant, in the absence of an essential governmental interest.  *Deck v. Missouri*, 544 U.S. 622, 624 (2005).  In *Deck*, the United States Supreme Court reasoned that the routine use of visible shackles during the guilt and capital penalty phases of trial may undermine the defendant's presumption of innocence, interfere with his ability to communicate with his lawyer and participate in his own defense, and is an affront to the dignity of judicial proceedings.  *Id.* at 631.  As a result, on direct appeal, "[t]he State must prove beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained."  *Id.* at 635 (quotation omitted).  However, on collateral review of a state court conviction, federal courts apply a more lenient standard, only granting a writ when an error had a "substantial and injurious effect or influence in determining the jury's verdict."  *Hatten v. Quarterman*, 570 F.3d 595, 604 (5th Cir. 2009) (quoting *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).  As a mixed question of law and fact, Logan must show that the state courts' denial of his claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

The record shows and the state appellate court found that, on August 11, 2006, defendant filed a "motion for new trial and a motion for post verdict judgment of acquittal" based upon the fact that a juror had viewed him wearing shackles.  A hearing was held by the trial court on September 22, 2006 and the defense called Deputy Barbara Barilleaux as a witness.  Deputy Barilleaux and another deputy were assigned to transport Logan to and from jail during his trial.  Logan was shackled and handcuffed while he was being transported, in accordance with standard procedure. After court had concluded one day during trial, Barilleaux and the other deputy were informed that everyone had been cleared from the courtroom.  They subsequently took Logan down to the first floor in the elevator, and the three of them got off.  Logan was placed against the wall by the elevator door inside the glass building facing Derbigny Street until transport arrived.   Deputy Barilleaux then saw a young man, identified as a juror, on a cell phone with his back to them.  The Gretna deputy was asked to have the juror go around the glass building and stand in that area.  After the juror left, they put Logan into the van and transported him back to the Jefferson Parish Correctional Center.[64]

The record indicates that there was no contact at all between the juror and defendant, and that it was not possible that the juror could have viewed defendant from where defendant was standing. Barilleaux stated that the juror did not come up to the glass doors of the courthouse and try to enter, nor did he come through those glass doors when Logan was there shackled or handcuffed.  Logan was also not shackled or handcuffed in front of the jury during trial, only while being transported to and from the jail.

_____

[64]The facts are adapted from the findings of the Louisiana Court of Appeal, Fifth Circuit in *Logan*, 986 So.2d at 787. Deference to the factual findings of the state court is required by 28 U.S.C. § 2254(e)(2).

As the State argues in its opposition, the Supreme Court in *Deck* was concerned about the impact on the jury from viewing the defendant in visible restraints *during the course of either the guilt phase of trial or during Deck's capital sentencing*.  Contrary to the situation in *Deck*, Logan was not tried or sentenced in shackles that were visible to the jury.  Instead, Logan's claim is that *one* jury member *may* have inadvertently seen him in shackles *while he was being transported by deputies back to the prison after the end of the day*.

First and foremost, the facts as developed in the state court do not support Logan's claim that the juror saw him in shackles.  However, even if Logan's version of the incident was true, the United States Supreme Court has never extended *Deck* to apply to such a situation.  As the State argues, "There is no Supreme Court precedent holding that a defendant is entitled to a new trial if a juror sees him in shackles during transport."[65]  Without such a precedent, Logan cannot establish that the state court's decision is "'contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States' . . . on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13 (quoting 28 U.S.C. § 2245(d)(1))[66]

---

[65]Fed. doc. 15 at p. 38, State's Response.

[66]In fact, Logan's case is more akin to *Mendoza v. Berghuis*, 544 F.3d 650 (6th Cir.), *cert. denied*, __U.S.__, 129 S.Ct. 1996 (2008), where four jurors briefly observed the defendant wearing hand and foot shackles in the hallway as he was being transported from jail.  The Sixth Circuit rejected a defense motion for mistrial, finding that the holding of *Deck* was limited to visible restraints seen by the jury at a trial (or courtroom) proceeding.  The *Mendoza* court noted that there was a difference between restraining a defendant in the courtroom and restraining him during transport.  "... [J]urors may well expect criminal defendants - at least ones charged with the kind of conduct at issue here - to be restrained during transport to the courtroom.  That several jurors may have seen Mendoza shackled during transport, therefore, would not necessarily suggest to them that he was shackled in the courtroom as well."  *Id.* at. 655.  *See also Parker v. Booker*, 2012 WL 3150822, at *8 (E.D. Mich. Aug. 2, 2012) (Limiting the holding of *Deck* to visible restraints being viewed at trial and not to prisoners being transported); *and*, *Woodyard v. Runnels*, 2006 WL 462485, at *7 (E.D. Cal., Feb. 27, 2006) (Jury's brief or inadvertent glimpse of a defendant in physical restraints outside the courtroom does not warrant habeas relief).

**D.     Admission of "Prejudicial", "Gruesome" Photographs**

Logan next argues that the trial court erred by admitting gruesome photographs of the victim into evidence and publishing them to the jury.  The state contends that, since the admission of the photographs in question did not play a "crucial, critical, and highly significant role in the jury's verdict," Logan is not entitled to federal habeas relief on this claim.[67]

Logan's claim that the photographs were introduced only to inflame the jury's emotions and to create prejudice against him was reviewed in the state courts on direct appeal.  The state appellate court applied state law and procedure and found that the photographic evidence was admissible to prove the manner of death and the location, placement, and number of the bullet wounds on the victim's body, as well as to provide positive identification of the victim.  The court also found that the prejudicial effect of the photographs did not substantially outweigh their probative value.[68]

To the extent that Logan is claiming a violation of state evidence rules, however, that argument is not cognizable on habeas.  *Estelle*, 502 U.S. at 67-68; *Swarthout*, __ U.S. __, 131 S.Ct. at 861-63 (federal habeas review does not lie for errors under state law); *and*, *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir.1992) ("Errors of state law, including evidentiary errors, are not cognizable in habeas corpus.").  The Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *McGuire*, 502 U.S. at 67-68; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975)).

---

[67]Fed. Doc. 15 at pp. 39-40.

[68]*State v. Logan*, 986 So.2d at 791-92.

34

The admission of evidence may violate the Due Process Clause of the Fourteenth Amendment if the evidence is "so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). A state court's evidentiary ruling implicates due process "only for rulings 'of such a magnitude' or 'so egregious' that they 'render the trial fundamentally unfair'." *Gonzales v. Thaler*, 643 F.3d 425, 430 (5th Cir. 2011). *See also Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998); *and*, *Pemberton v. Collins*, 991 F.2d 1218, 1226 (5th Cir.1993) (state evidentiary ruling presents a cognizable federal habeas claim if the ruling results in a "denial of fundamental fairness."). Moreover, the erroneous admission of prejudicial evidence will justify federal habeas relief only if the admission was a "crucial, highly significant factor in the defendant's conviction." *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007) (quoting *Neal*, 141 F.3d at 214).

The record establishes that, immediately prior to Deputy Goodwin's testimony, defense counsel objected to the admission of certain photographs on the grounds that the evidence was more prejudicial than probative.[69] Deputy Goodwin was the law enforcement officer in charge of taking photographs, including of the victim's body and processing the body of the victim.[70] The prosecutor agreed at that time not to publish the photographs to the jury but instead to have the witness identify them. The judge also admonished the prosecutor not to have the witness flip the pictures over so the jury could see them.[71]

---

[69]State Rec. vol. 3 at pp. 577-78.

[70]State Rec. vol. 3 at p. 579.

[71]State Rec. vol. 3 at p. 578.

The prosecutor showed Deputy Goodwin State's Exhibits 13-26, *in globo*, which were identified as photographs of the victim in the emergency room.  These photos were not viewed by the jury at that time, although other photographs taken by Deputy Goodwin were admitted.[72]  After the deputy finished testifying, defense counsel renewed his objections to photographs being admitted that were taken of the victim.[73]  The prosecutor indicated that the pathologist to the coroner had looked over the photographs of the victim and had thrown out the "bloody ones" for showing "too much blood."[74]

The court viewed the photographs and had a sidebar with counsel, "These aren't.  I mean, this is his face.  We've got to I.D. him.  The rest of them are close-ups of the wound in the heart, which they removed.  These are not bad at all."[75]  Subsequently, the State offered State's Exhibits 50-57, identified by the pathologist as photographs of the decedent and the wounds that he sustained.  Defense counsel had no objection to the admission of these photographs.[76]  At the conclusion of the

---

[72]For example, photographs of the injured co-defendant and his clothing, the vehicle that transported the co-defendant to the hospital and the gunshot residue kits were admitted into evidence and viewed by the jury.

[73]State Rec. vol. 3 at pp. 589-90.

[74]State Rec. vol. 3 at p. 590.

[75]State Rec. vol. 3 at p. 591.

[76]State Rec. vol. 3 at p. 601.  Specifically, Dr. Garcia, the pathologist, testified that State's Exhibit 50 depicted the victim's face prior to the beginning of the autopsy and prior to them removing the medical devices found on the body. She noted that the victim's right eye was bruised and swollen and indicated that it was the result of a recent injury of blunt force nature.  She testified that State's Exhibit 51 depicted the victim's left arm with one of the wounds he sustained; State's Exhibit 52 depicted the wound to the chest showing an oval shape indicating a re-entrance wound; State's Exhibit 53 was a photograph of the entrance wound into the victim's heart; State's Exhibit 54 showed an exit wound on the back of the arm; State's Exhibit 55 depicted entrance wound number three near the elbow and the location from which she recovered a projectile; State's Exhibit 56 showed one of the entrance wounds going into the elbow; and State's Exhibit 57 depicted the extensive nature of the exit wound "partially from number 3, because it fractured some bone in number 2, which also caused it to re-enter into the chest cavity."  State Rec. vol. 3 at pp. 601-03.

State's case, the State also offered State Exhibits 13-26, identified as photos of the autopsy taken by Goodwin in the emergency room, into evidence. Defense counsel indicated that he had no objection to the admission into evidence of these photos[77] and the photos were published to the jury.[78]

As the state appellate court found, the autopsy photographs were relevant to show the manner of death and the location, placement, and number of bullet wounds on the victim's body. Additionally, Dr. Garcia used the photographs to illustrate the trajectory of each bullet that wounded the victim.  Logan's defense was self-defense, thus the photographs were employed to illustrate that the victim likely was in a defensive posture.[79]  Moreover, the photographs showing "too much blood" were eliminated from the admitted evidence.  Those remaining photographs were viewed by the trial court and determined to be necessary for identification of the victim and deemed "not bad at all."[80]  Finally, although defense counsel initially objected to the admission of the photographs when they were identified by Deputy Goodwin, after the testimony of Dr. Garcia establishing that the photographs were probative, defense counsel had no further objections.[81]

On the record before this court, Logan fails to establish that the state court's evidentiary ruling permitting the admission of the autopsy photographs rendered his trial "fundamentally unfair',

---

[77]State Rec. vol. 5 at p. 1159.

[78]State Rec. vol. 5 at p. 1177-78.

[79]State Rec. vol. 3 at pp. 611 and 627.

[80]State Rec. vol. 3 at p. 591.

[81]State Rec. vol. 5 at p. 1159.

thus violating due process.  He thus fails to establish that the state court's decision was "an unreasonable application of . . . clearly established Federal law," pursuant to 28 U.S.C. § 2254(d)(1).

### E.    Ineffective Assistance of Counsel: No Objection Regarding Non-Unanimous Jury

Logan's next claim is that his attorney was ineffective in failing to bring a pre-trial challenge to La. Code Crim. P. art. 782(A), which allows for non-unanimous jury verdicts.[82]  Logan contends that his lawyer should have argued that La. Code Crim. P. art. 782(A) is unconstitutional as applied to his case.  He specifically asserts that his case is different than "similarly situated offenders" because he was initially charged with first degree murder (requiring a unanimous jury) and the charges were subsequently amended to second degree murder (requiring 10 out of 12 jurors to agree). He offers no further explanation of how this amendment to his charges sets him apart and the court finds nothing in the record to support any distinction.  Logan claims his lawyer should have challenged the number of jurors required to convict as to the second type of cases contemplated by the statute, i.e., non-capital cases that necessarily require confinement at hard labor if convicted.

Logan first raised his claim that his attorney was ineffective in failing to raise the statutory challenge to La. Code Crim. P. art. 782 during state post-conviction proceedings.  The state appellate court found that the district court had correctly denied this claim.  The court stated that counsel was

---

[82]La. Code Crim. P. art. 782 provides:
Number of jurors composing jury; number which must concur; waiver
    A.  Cases in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict.  Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.  Cases in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict.

not deficient in recognizing that  the Louisiana Supreme Court had already found La. Code Crim. P. art. 782 to be constitutional (citing *State v. Bertrand*, 6 So.3d 738 (La. 3/17/09)),[83] and the Louisiana Supreme Court similarly denied relief.[84]  The decision of the Louisiana Fifth Circuit was the last reasoned opinion on the issue, because the Louisiana Supreme Court denied relief without further comment on the merits of the claim.  *See Ylst*, 501 U.S. at 802 (when the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion).

The issue of ineffective assistance of counsel is a mixed question of law and fact.  *Richards v. Quarterman*, 566 F.3d 553, 561 (5th Cir. 2009).  The question is whether the state courts' denial of relief was contrary to, or an unreasonable application of, United States Supreme Court precedent.

The appropriate standard for judging the performance of counsel was established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and prejudice therefrom.  *See Strickland*, 466 U.S. at 697.  The petitioner has the burden of proving ineffective assistance of counsel by a preponderance of the evidence.  *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000); *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992).  In deciding ineffective assistance claims, a court need not address

---

[83]See Fifth Circuit's decision in State Rec. vol. 30, Writ No. 11-KH-214 dated 4/25/11.

[84]*State ex rel. Logan v. State*, 80 So.3d 479 (La. 2012).

both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. *Amos v. Scott*, 61 F.3d 333, 348 (5th Cir. 1995).

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "The defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. The analysis of counsel's performance must take into account the reasonableness of counsel's actions under prevailing professional norms and in light of all of the circumstances. *See Strickland*, 466 U.S. at 689; *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009). The reviewing court must "'judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 787 (2011) (citing *Strickland*, 466 U.S. at 689).

In order to prove prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Williams v. Thaler*, 602 F.3d 291, 310 (5th Cir. 2010). Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice." *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009) (quoting *Strickland*, 466 U.S. at 695). In this context, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cullen*, 131 S.Ct.

at 1403 (quoting *Strickland*, 466 U.S. at. 694).  This standard requires a "substantial," not just "conceivable," likelihood of a different result.  *Harrington*, 131 S.Ct. at 792.

In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett v. McCotter*, 796 F.2d 787, 793 (5th Cir. 1986).  Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief.  *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (citing *Ross*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

On habeas review, the United States Supreme Court has clarified that, in applying *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington*, 131 S.Ct. at 788.  The *Harrington* Court went on to recognize the high level of deference owed to a state court's findings under *Strickland* in light of AEDPA standards of review:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 788 (citations and quotation marks omitted).

Thus, scrutiny of counsel's performance under § 2254(d) is "doubly deferential." *Cullen*, 131 S.Ct. at 1403 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  The federal courts must take a "highly deferential" look at counsel's performance under the *Strickland* standard through the

41

"deferential lens of § 2254(d)." *Id.* (citing *Strickland*, 466 U.S. at 689, and quoting *Knowles*, 556 U.S. at 121 n.2).

In this case, Logan's counsel was not deficient in failing to challenge the non-unanimous jury verdict set forth in LSA-C.Cr. P. art. 782(A) for to do so would have been frivolous in light of the Louisiana and United States Supreme Court jurisprudence. The law is clear that an attorney is under no obligation to raise an argument when the chance of success is unlikely. *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir.1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir.1995) ("Counsel cannot be deficient for failing to press a frivolous point."); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir.1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite.").

In *State v. Bertrand*, 6 So.3d 738 (La. 2009), the Louisiana Supreme Court, relying on U.S. Supreme Court precedent as set forth in *Apodaca v. Oregon*, 406 U.S. 404 (1972), rejected a challenge to a non-unanimous jury verdict. *Bertrand* also recognized that Louisiana's long-established state jurisprudence, which held that La. Code Crim. P. art. 782 was constitutional, was consistent with the United States Supreme Court's holding in the 1972 case of *Apodaca*. *See e.g.*, *State v. Jones*, 381 So.2d 416 (La. 1980) (Article 782 does not violate the Sixth and Fourteenth Amendments); *State v. Simmons*, 414 So.2d 705 (La. 1982) (Article 782 does not violate the Fifth or the Fourteenth Amendments); and, *State v. Green*, 390 So.2d 1253 (La. 1980) (Upholding the constitutionality of Article 782 generally). Thus, at the time of Logan's trial, counsel would have

42

known that the state court's upholding of the constitutionality of Article 782 was well-supported by controlling state and federal law. Making an argument contrary to controlling precedent, therefore, would have been frivolous.

In sum, Logan's claim of ineffective assistance of counsel based upon his attorney's failure to challenge the non-unanimous jury verdict in his case fails to meet the requirements of *Strickland*. Counsel was not deficient in failing to raise a challenge that was directly contrary to controlling state and federal jurisprudence. Additionally, since *Apodaca* is still the controlling precedent, Logan cannot show that his lawyer would have prevailed even if the challenge had been made. He thus was not prejudiced by his lawyer's failure to raise the claim. The state court's decision denying relief on Logan's ineffective assistance claim is not contrary to Supreme Court law thus Logan is not entitled to relief.[85]

### F. Ineffective Assistance of Counsel: Failure to Retain Forensic Expert

Finally, Logan's last claim for habeas relief also is alleged within the context of ineffective assistance of counsel, a claim once again controlled by *Strickland*. Specifically, Logan contends that his trial counsel was ineffective when he failed to retain a forensic expert to testify for the defense and who allegedly could have countered the testimony of the State's forensic expert. He indicates that, pre-trial, the defense lawyer indicated he planned to call Ron Singer, a forensics and crime

---

[85]Logan attempts to argue that *Apodaca*, a plurality opinion, is of questionable validity. *See* Fed. doc. 3 at pp. 50-51. However, to prevail on federal review, Logan must show more than the possibility that the *Apodaca* decision may be vulnerable to being altered in the future by the Supreme Court. Rather, he must show that there is settled United States Supreme Court jurisprudence that the state court's failed to follow when relief was denied in his case. He is unable to make such a showing. *See* 28 U.S.C. §2254(d)(1).

scene reconstruction expert.  Ultimately, however, Logan claims his lawyer rendered ineffective assistance by failing to call or subpoena Mr. Singer to testify.

Logan also specifically attacks the State's use of a Power Point demonstration prepared by the state's forensic expert, Captain Timothy Scanlan, saying the state used the Power Point to bolster its claim that the murder of the victim occurred during a robbery or aggravated robbery because the state's evidence in that area was otherwise lacking.  He claims that, had his attorney called a defense expert, the expert would have explained that  the State's Power Point presentation was "misleading" in that it "was not drawn to scale" and "did not include objects that were in the patio area where the shooting took place".  In sum, Logan contends that a defense expert in forensics would have been able to undermine the state's theory of the case as presented in its Power Point presentation.[86]

The State argues that Logan's claim that a defense expert would have helped his case is purely speculative.  The State points out that Logan does not specify what a defense forensic expert would have found, how such an expert could have arrived at conclusions different than Scanlan's, which of Scanlan's findings could be subject to a different interpretation, or how such an expert could have contradicted Scanlan's testimony.  Additionally, the State asserts that the extensive cross-examination of Scanlan, the State's expert, by defense counsel regarding Scanlan's findings and conclusions was sufficient to test the State's presentation of its case.  In sum, the State argues that the decision of Logan's counsel not to call a defense expert was a strategical one and not the result of ineffective assistance.[87]

---

[86]Rec. Doc. 3 at pp. 55-60.

[87]Fed. Doc. 15 at pp. 54-56.

The state trial court, applying the controlling U.S. Supreme Court jurisprudence set forth in *Strickland*, denied Logan's post-conviction claim, finding that Logan's assertions of how an expert could have undermined the state's case to be speculative and conclusory in nature. Logan "provided no evidence as to what a defense-hired forensic expert would have testified, or how it would have changed the outcome of the trial."[88] The state trial court thus found that Logan failed to prove either prong of *Strickland*, particularly given the "overwhelming evidence" placed before the jury.[89]

The Louisiana Court of Appeal agreed with the trial court's ruling that Logan's claim was speculative and conclusory, stating, "he failed to show what the expert would have testified to or how it would have changed the outcome of trial."[90] This was the last reasoned decision of the state court's as the Louisiana Supreme Court simply denied Logan's request for supervisory writs.[91] *See Ylst*, 501 U.S. at 802.

To prevail on an ineffective assistance claim based upon uncalled witnesses, including an expert witness, a habeas petitioner must show that he was prejudiced by counsel's decision not to call an expert. Thus he must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. There are "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689. In some cases, counsel

---

[88]State Rec. vol. 30, Trial Court's Order dated 1/19/11.

[89]State Rec. vol. 30, Trial Court's Order dated 1/19/11.

[90]See Fifth Circuit's decision in State Rec. vol. 30, Writ No. 11-KH-214 dated 4/25/11.

[91]*State ex rel. Logan v. State*, 80 So.3d 479 (La. 2012).

would be considered ineffective for failing to consult with or call an expert but state courts would have a wide latitude in making such a determination. *Harrington*, 131 S.Ct. at 789.

In order to demonstrate prejudice arising from failure to call witnesses, the petitioner must show that the witness would have testified at trial and that the testimony would have been favorable. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). There must be a reasonable probability that the uncalled witnesses would have made a difference to the result at trial. *Id.* at 603. Claims of uncalled witnesses are disfavored, especially if the claim is unsupported by evidence indicating the witnesses's willingness to testify and the substance of the proposed testimony. *See Harrison v. Quarterman*, 496 F.3d 419, 428 (5th Cir.2007). Moreover, with respect to calling experts, it is clear that *Strickland* does not require for every prosecution expert an equal and opposite expert from the defense. *See Harrington*, 131 S.Ct. at 791 (It is well within the bounds of a reasonable judicial determination for a state court to conclude that defense counsel could follow a strategy that did not require the use of experts). Additionally, the United States Supreme Court has recognized that "[i]n many instances, cross examination [of the prosecution's expert] will be sufficient to expose defects in an expert's presentation." *Id.* at 791.

In this case, the prosecution put on an extraordinary amount of expert evidence through their well-credentialed witness, Captain Timothy Scanlan.[92] Scanlan reconstructed the crime scene for

---

[92]Scanlan was accepted by the court, after defense stipulation, as an expert in firearm and tool examinations, crime scene reconstruction, blood stain analysis and forensic science, in general. Scanlan had a Masters Degree in forensic science and was working toward his Doctorate in forensic science as applied to homeland security. He was the Assistant Director of the Jefferson Parish Crime lab with approximately 8 years of experience, an adjunct professor at Loyola University where he taught Forensic Science and Forensic Chemistry and had previously taught Forensic Science at Delgado Community College. Scanlan had been accepted by various courts as an expert in the same four areas of forensic science as he was in this case. *See* State Rec. vol. 3, Testimony of Timothy Scanlan at pp. 718-25.

the jury based upon gun powder stippling, bullet trajectories, bullet markings, bullet casing groupings, bullet "sounds", blood splatter and/or blood transfer evidence as well as through DNA match-ups.  Based upon his forensic analysis, Scanlan opined that the victim was being shot at from two shooters, each bearing .380 automatic weapons; that the driver of the truck (Logan) shot seven times while on the outside of the truck and the passenger (Cambre) shot four times from the patio. He concluded that the victim had shot back five times with a 22 caliber mini-revolver, with one bullet hitting Cambre.  Additionally, one of the casings from the perpetrators was recovered from the white Toyota truck, thus linking the truck to the scene of the crime.[93]

Logan offers nothing that a defense expert would have testified to which would counter the crime scene reconstruction as explained by Scanlan.  He complains that defense counsel had indicated he would call Ron Singer, "a crime scene reconstruction expert", but does not offer any details of how Mr. Singer's evaluation of the crime scene would have altered or undermined the one offered by Scanlan.  He thus fails to show that Singer was willing to testify or what the content of his testimony would have been.

In contrast, the record shows that counsel vigorously cross-examined Scanlan.[94]  For example, the defense counsel challenged Scanlan's analysis of when the arterial spurt (from blood pumping in the victim's wounded heart) would have occurred,[95] why the trajectory of the victim's bullets were not listed on the State's diagram and why Scanlan could not determine with any

---

[93]State Rec. vol. 3 at pp. 730-49; State Rec. vol. 4 at pp. 750-914, p. 907 (summary opinion).

[94]State Rec. vol. 4 at pp. 915-1034.

[95]State Rec. vol. 4 at p. 918.

certainty where the truck's location had been in the driveway.[96]  He challenged the ability of the "ear

witness" to describe rapid firing of various guns,[97] challenged the diagram used by Scanlan as not

being to scale,[98] and pointed out that various items in the crime scene may have been moved or

altered by the "post-attack activity" from EMT's, neighbors, etc. before Scanlan was able to

investigate.[99]  Defense counsel also implied that the location of the truck and pieces of glass may

indicate that the victim shot the truck window out first[100] and pointed out discrepancies between the

Power Point used when Scanlan testified in Cambre's hearing compared to the one used in

Logan's.[101]  Thus the record suggests that counsel made the strategic choice to attack the State's

expert through cross-examination rather than through use of an expert.

Finally, Logan complains that his attorney should have used a defense expert to show that

the diagram used in Scanlan's Power Point presentation was not drawn to scale and therefore was

misleading.  However, the jury was aware that the diagram was not drawn to scale as defense

counsel got Mr. Scanlan to admit that point on cross-examination.[102]

Logan's conclusory and unsupported contention that a defense expert would have been able

to counter the crime scene reconstruction theory offered by Scanlan is simply unsustainable.  He

---

[96]State Rec. vol. 4 at pp. 917-18.

[97]State Rec. vol. 4 at p. 923.

[98]State Rec. vol. 4 at p. 925.

[99]State Rec. vol. 4 at pp. 939-40.

[100]State Rec. vol. 4 at pp. 935-37.

[101]State Rec. vol. 4 at pp. 947-49.

[102]State Rec. vol. 4 at p. 925.

fails to show that he was prejudiced from counsel's strategic choice not to call an expert and thus fails to meet his burden under *Strickland*.  Nor has he established that his counsel's performance was deficient in any way, that his trial was rendered fundamentally unfair by his counsel's performance, or that his counsel's actions prejudiced him.  As such, he fails to establish that the state court's decision denying relief was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  *See* 28 U.S.C. § 2254(d)(1).  Logan is not entitled to relief on this claim.

## VII.   Recommendation

For the foregoing reasons, it is **RECOMMENDED** that Donald Logan's petition for issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415, 1430 (5th Cir. 1996).[103]

New Orleans, Louisiana, this 24th day of April, 2013.

_____
**KAREN WELLS ROBY
UNITED STATES MAGISTRATE JUDGE**

---

[103]*Douglass* referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.